592 So.2d 460 (1991)
Michael O. WAGUESPACK
v.
Mr. and Mrs. Louis E. PROSPERIE, et al.
No. 91-CA-230.
Court of Appeal of Louisiana, Fifth Circuit.
December 11, 1991.
Rehearing Denied February 14, 1992.
*461 Lanny R. Zatzkis, Lawrence E. Mack, Deborah M. Sulzer, New Orleans, for plaintiff/appellant.
Louis E. Prosperie, in pro. per.
Before GRISBAUM, WICKER and FINK, JJ.
ELORA C. FINK, Judge Pro Tem.
This appeal arises in a redhibition suit by Michael O. Waguespack against Mr. and Mrs. Louis E. Prosperie and others. Waguespack appeals a judgment sustaining the defendants' peremptory exception of prescription and dismissing his suit against these defendants. We affirm, for the reasons that follow.
In 1961 Mr. and Mrs. Prosperie had a home built in Metairie, Louisiana. In 1974 they built a weekend home or "camp" in Mississippi. On April 11, 1980, they sold their Louisiana home to Waguespack. On July 25, 1988, Waguespack filed suit for redhibition or for reduction of the purchase price against the Prosperies.[1] Also made defendants were the estate of Freddie C. Vicknair (the contractor who built the house) and the Parish of Jefferson (which issued the building permits and approved the construction). The estate of Vicknair, through the Vicknair heirs, was dismissed from the suit in November 1988 on an exception of peremption.
In his petition for damages, Waguespack made the following allegations: When he purchased the premises from the Prosperies in 1980, he asked them whether they had noticed cracks in the house and they stated they had not. On or about August 6, 1987 "he noticed considerable cracks in the exterior walls." Thereafter he learned "that some of these cracks existed prior to his purchase of said residence but were patched prior to his purchase of the residence" and, as a result of the patchwork, he had not noticed the cracks when inspecting the premises. He alleged the cracks are the result of a foundation problem that has required extensive repairs.
The Prosperies filed exceptions of no cause of action, prescription, and peremption. The trial judge overruled the exception of no cause of action, but maintained the exception of prescription and dismissed Waguespack's suit against the Prosperies.
On appeal Waguespack asserts the trial court erred in failing to find the Prosperies were in bad faith when they sold the house *462 without declaring the vice; in concluding there was no suspension of prescription during the sellers' absence from the state; and in failing to consider the overwhelming evidence that Mr. and Mrs. Prosperie became domiciled in Mississippi within one year after the act of sale.

BAD FAITH
The Civil Code defines redhibition as "the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice." (Emphasis added.) LSA-C.C. art. 2520.
The Prosperies' exception of prescription was decided under LSA-C.C. art. 2534, which states:
The redhibitory action must be instituted within a year, at the farthest, commencing from the date of the sale.
This limitation does not apply where the seller had knowledge of the vice and neglected to declare it to the purchaser.
Nor where the seller, not being domiciliated in the State, shall have absented himself before the expiration of the year following the sale; in which case the prescription remains suspended during his absence. [Emphasis added.]
When a seller is in bad faith "the action for redhibition may be commenced at any time, provided a year has not elapsed since the discovery of the vice." LSA-C.C. art. 2546.
Waguespack asserts that the vice was one which the Prosperies knew but did not declare to him and that he filed suit within one year from discovery of the vice; thus, he contends, his action is not prescribed. He urges as error the trial judge's reference to fraud as opposed to bad faith.
Waguespack testified he first noticed cracks in the exterior walls in August 1987, as he was preparing his house to be placed on the market for sale. He noticed the material in the cracks was of a different color and texture to the original mortar. After Waguespack noticed the exterior cracks, he discovered that the kitchen window could not be opened and that its frame was bent. (He had never tried to open that window before that.) He stated:
The cracks were in areas that unless you're going to look for them, I don't know why you would necessarily see them.
* * * * * *
They were the types of cracks thatI mean, it's not like something that should be obvious to anybody if you're looking around your house for problems. It's the kind of thing you're going to find if you're looking for problems.
* * * * * *
The cracks in the mortar were on the driveway side of the house. There were really three areas that were observable. There was one between the kitchen window and the window to the living room.
* * * * * *
I would say when I initially saw them, they were probably in terms of several inches in length and in thickness, I mean, it would be like, you know, the size of a hair. I mean it's justit was a very thin crack that wasn't very long. By the time we had the repairs done, they were longer and they were wider.
* * * * * *
Crack number two would be by the door fairly high up, in fact, not at eye level. Higher than eye level. And it was, again, a small crack, again, a few inches and I'm havingas I said, by the time the repairs were done and that to me is more visible because by then the cracks were larger.
He stated the second crack was at a level higher than six feet, "several inches in length [a]nd a hairline type of a crack." He described the third crack as being "[a] few inches" off the ground and "towards the front of the house still along that same wall but down near ground level. In fact, right above where the brick would come into the slab." The third crack was more difficult to find because it was near the gutter downspout. He found more exterior cracks on the slab itself on the other *463 side of the house. These were difficult to find due to the bushes on that side.
There was conflicting testimony on Waguespack's inquiries about foundation problems. Waguespack testified he specifically asked the Prosperies if there were problems with the foundation:
The conversation was more or less, and I'm trying to think back to the exact words, but I recall that it dealt with the existence of cracks and I remember specifically asking them whether or not they had seen any cracks anywhere in the house that might indicate there was some type of a problem and their response was that they had not. I really didn't pursue it any further because I knew that the house was on a concrete slab on pilings. I had grown up in the area and I was familiar with the neighborhood and I knew of no one in that neighborhood that had had foundation problems, so when I asked the Prosperies whether they had seen any such problems and they told me no, [and] I didn't visibly see any problems, my experience with the neighborhood was that there weren't any problems; Ithat'sthe subject was dropped after that. [Emphasis added.]
Prosperie, on the other hand, testified he did not recall whether Waguespack asked him a question concerning any problem with the foundation. He stated that the "little small cracks that they had was normal maintenance." He admitted patching and painting over "small little normal cracks ... hairline cracks," in the ceiling of one bedroom. These repairs, which he called maintenance repairs, were done four or five years before he sold the house to Waguespack. He also testified he had never used the window referred to as having a bent frame. He stated, "It was like a permanent window[.]"
At the close of trial the trial judge rendered lengthy oral reasons for judgment, which are excerpted in part here:
I cannot find Mr. Prosperie or his deceased wife in bad faith. There were evidently, at some time in the history of this home, some cracks, exterior and interior in nature. Mr. Prosperie testified that he mortared some of the, what he called "few" cracks on the outside. He said there were some inside cracks in the ceiling which he described as small and normal. He called these hairline maintenance cracks.... [H]e undertook to do what he considered to be normal maintenance on these cracks.
I note that Mr. Prosperie purchased the house in 1961 from the builder, Mr. Vicknair. Mr. Waguespack, in 1980, purchased a nineteen-year-old house in Metairie and at the time of filing suit the house, by my calculations, was approximately twenty-seven years old.
I cannot say that Mr. Prosperie was in bad faith within the meaning of this article... that is, I cannot say that Mr. Prosperie had knowledge of vices and defects which were redhibitory in nature and I refer to Article 2520 * * *. So our law is concerned with defects of a serious nature, substantial defects, ... and I don't believe that the knowledge that Mr. Prosperie possessed in 1980 regarding these cracks was of such a nature that it required him to disclose and declare to the purchaser, Mr. Waguespack, that there were certain defects in his home.
Most homes in Metairie that are approaching twenty years of age have some cracks and I don't believe it's incumbent upon someone selling a nineteen-year-old home to point out every crack in the ceiling or every outside crack; and I don't believe that a person who owns a nineteen-year-old home, who knows that there are some hairline cracks, is possessed of such knowledge that he would in fact know that the house is defective, or that the foundation is somehow defective, and therefore that he's committing what amounts to a fraud when he fails to declare it.
So I cannot say, based on the testimony I've heard here today, that Mr. Prosperie was in bad faith in selling this home.
The issue to be considered is not whether the defendants knew of the cracks which Mr. Prosperie patchedobviously, *464 they didbut rather whether their knowledge of these "hairline maintenance cracks" was sufficient to establish they knew there was a structural foundation defect which they concealed.
Waguespack cites Leflore v. Anderson, 537 So.2d 215 (La.App. 4 Cir.1988), to support his contention that a seller's patching of cracks indicates knowledge of a structural foundation defect. That case is distinguishable, however, because in it "the house basically began to fall apart only months after its purchase by plaintiff." Id. at 217. In the instant case, Waguespack did not discover foundation problems until seven years after the purchase. The Leflore opinion also makes no reference to the size of the cracks previously repaired.
This Court has recognized a presumption of knowledge where the person in question had relevant expertise:
We hold that a person with engineering and construction knowledge who plans, designs and personally supervises the building of an addition to a residence is presumed to be aware of any structural defect, and the lack of knowledge regarding any structural defect is imputed to him.
Pickron v. Krebs, 441 So.2d 272, 274 (La. App. 5 Cir.1983), writ denied, 442 So.2d 481 (La.1983).
Although the trial judge referred to "fraud" in part of his discussion, it is clear from the context of these statements that he applied the standard of bad faith described in C.C.Art. 2534. He concluded the Prosperies did not have knowledge of defects "which were redhibitory in nature."
We conclude the judge did not err in giving greater weight to Prosperie's testimony that the cracks he patched were "hairline maintenance cracks." In factual determinations based on witness credibility, an appellate court may not reverse the trier of fact's finding unless it is clearly wrongthat is, manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
We agree with the trial court that knowledge of hairline cracks in a 19-year-old house, by a person with no expertise in structural defects, may not be presumed to equate with knowledge of a structural foundation defect. There is no evidence that Prosperie had any knowledge of engineering or construction. As Waguespack's own testimony established, there was no reason at the time he bought the house to believe there were foundation problems. The Prosperies should not be held to a higher standard of knowledge, as ordinary people, than that. Thus, the Pickron presumption does not apply.
Furthermore, Waguespack testified that he noticed the frame of the kitchen window was bent but that he had never tried to open that window until 1987. La. Civ.Code Art. 2521 provides: "Apparent defects, that is, such as the buyer might have discovered by simple inspection, are not among the number of redhibitory vices." The bent frame on a window that would not open is discoverable upon simple inspection; therefore, in this case it cannot be said to be a redhibitory defect.
We find no manifest error in the judge's conclusion that Prosperie did not have knowledge of the redhibitory vicethat is, the defect in the house's foundation. Accordingly, the court correctly concluded the prescriptive period was not suspended due to bad faith on the part of the sellers.

CHANGE OF DOMICILE
Waguespack also argues prescription was suspended because the Prosperies moved from Louisiana to Mississippi within a year from the date of sale. He asserts this invokes the third paragraph of Civil Code Art. 2534, which states the one-year prescription applicable to redhibitory actions does not apply "where the seller, not being domiciliated in the State, shall have absented himself before the expiration of the year following the sale; in which case the prescription remains suspended during his absence."
In dismissing this argument, the trial judge stated:
I turn now to the exception dealing with the fact that Mr. Prosperie retired *465 and went along with his wife to live at his camp in Mississippi. It's difficult for me to say whether or not the man truly intended to be domiciled in the State of Mississippi, but I don't believe it's necessary for me to reach that. * * *
The court noted that Art. 2534 has been part of our law since the modern revision of the Civil Code. When it became part of the Code, prescription was interrupted only by service of process on a defendant; now, however, prescription is interrupted merely by filing a timely suit in a court of competent jurisdiction. The court reasoned the legislature originally must have provided for suspension of prescription when a person is an absentee because the lawmakers were concerned that Louisiana citizens be protected from people who might sell property, then depart the state, leaving the Louisiana buyers unable to bring suit within a year after discovering redhibitory defects. The court concluded:
What happens when a person simply moves out of this state, as Mr. Prosperie did? ... [D]oes prescription remain suspended forever? * * * Of course not. That would be ridiculous and that could not be the law. So when a codal article leads to ... absurd conclusions, the courts are mandated to use reason and common sense. And reason and common sense would dictate that a prescriptive period in a case where a man leaves the state, as Mr. Prosperie did, and sets [up] a domicile in another state, would become a reasonable amount of time in which to bring the lawsuit. I liken this to the federal courts' doctrine of laches and I believe Mr. Waguespack had a reasonable time in which to bring the lawsuit. * * * So when does prescription run? As I've indicated, I believe it's a reasonable amount of time and I've concluded that some eight-plus years is simply not a reasonable amount of time.
We agree with the appellant's contention that this interpretation was an error of law. Article 2534 contains no such time limitation, nor can we extend it to include a "doctrine of laches." We cannot alter the clear wording of a codal article; any changes in the article's language must be addressed by the legislature.
The trial court's ruling is not reversible error, however, because our independent review of the record discloses ample evidence to support the trial judge's conclusion that prescription was not suspended in this case. There is uncontroverted testimony the Prosperies remained domicilaries of Louisiana for more than one year after the sale.
There was testimony in this regard from the Prosperies' daughter, several friends of the family, and from Mr. Prosperie, as well as documentary evidence.
Linda Stilley, the Prosperies' daughter, testified that her parents moved to an apartment in Metairie for four or five months after Waguespack bought the house from them, because the house sold faster than they anticipated and her father had not yet retired. He planned to retire to the camp in Mississippi and he and Mrs. Prosperie spent every second weekend there until August 1980, when he finally retired. After that her parents visited the camp every weekend. She explained that her mother felt the camp was too small to settle in at that time.
From the apartment in Metairie her parents moved in with her in Kenner and lived with her until 1983, when they remodeled their camp and moved to Mississippi.
Francis Stilley, Linda Stilley's mother-in-law, testified she has known the Prosperies for approximately 25 years. She visited them in the Metairie apartment in which they lived for four or five months after the sale of the house. The Prosperies then moved in with Linda and her husband and lived with the Stilleys for approximately two years. She was positive the Prosperies had not lived full-time in Mississippi until the camp was completed.
Lana Smith testified she has known the Prosperies for approximately 30 years. After they sold their house the Prosperies went to the camp on weekends and holidays, but lived in an apartment for a few months. Then they moved in with their daughter, where they lived for about two *466 years. They moved to their camp in Mississippi around 1982 or 1983.
Alfred Castillon testified he has known the Prosperies for over 20 years, as part of a group of people with whom Castillon and his wife play cards. He had been at the Stilley home for card games while the Prosperies were living there. The Prosperies decided to fix their camp and live there permanently around 1982 or 1983.
Ernest Hutchins testified he knew the Prosperies through Linda's husband, Dennis Stilley. He had known Dennis Stilley for 23 years and the Prosperies for 22 years. After the sale of their home the Prosperies moved to an apartment for four or five months and then to the Stilley home. The Prosperies moved permanently to Mississippi between 1983 and 1985.
William J. Clark, III, testified he has known the Prosperies for approximately 20 years. In the later part of 1980 the Prosperies moved in with the Stilleys. When the Prosperies lived with the Stilleys, he saw them in the Stilley residence "at least every other week or once every two or three weeks at a minimum." The Prosperies had a bedroom upstairs and would come in to tell him goodnight when he was there playing cards. He admitted he didn't know how many nights a week the Prosperies stayed at the Stilleys. The Prosperies moved to Mississippi approximately 1 ½ to 2 years after they moved into the Stilley residence.
Louis Prosperie testified he built the Mississippi property in 1974. From 1970 to 1980 they spent mostly weekends at the camp, although "oftentimes we'd spend a whole week out there." After the sale of their home they moved into an apartment from May 1, 1980 through August, 1980. After the apartment they moved in with the Stilleys. They had not moved directly to the camp after the sale because his wife felt the camp was too small.
He stated he had applied for a Mississippi driver's license on July 31, 1981, and he identified Mississippi voter identification cards for he and his wife dated September 18, 1984. A contractor's estimate dated August 1, 1983, for work done on the Mississippi camp was introduced. He stated it was after this construction that he and his wife moved to Mississippi and that he and his wife became Mississippi domiciliaries in the latter part of 1982. He admitted he applied for a Mississippi homestead exemption in 1981 because he had to apply one year before the move.
On cross-examination he admitted his 1981 federal income tax return and 1980 Louisiana tax return carried the Mississippi address. The only Mississippi tax return introduced was for the year 1982 and also bore the Mississippi address.
To establish the extent of the Prosperies' stays in Mississippi Waguespack introduced a number of cancelled checks, all identified by Linda Stilley as bearing her mother's signature. The first series, dated from June 23, 1978 to July 2, 1980, were drawn on the Prosperies' Louisiana bank and all were payable to supermarkets. All of the endorsements on these checks were by Louisiana banks. The plaintiff also introduced a series of checks drawn on the Prosperies' account at a Mississippi bank, again under Mrs. Prosperie's signature and all to a supermarket, dated from September 26, 1980 to December 28, 1982 and bearing endorsements by Mississippi banks.
In addition, the plaintiff introduced checks drawn on the Prosperies' Louisiana bank payable to a telephone company, dated from August 28, 1979 to August 1, 1980, as payment for a telephone in Mississippi. He also introduced 23 checks drawn on the Prosperies' Mississippi bank from August 21, 1980 to October 19, 1982, payable to a telephone company, bearing the notation these were payments for a Mississippi telephone.
Reviewing all the evidence, we find no error in the trial judge's conclusion that prescription was not suspended. The plaintiff was required to prove his case by a preponderance of the evidence. The Prosperies did not apply for a Mississippi homestead exemption until 1981 and Mr. Prosperies' testimony that he was required to file one year before he moved there was uncontroverted. His testimony that he *467 continued to be domiciled in Louisiana for over a year after the sale was corroborated by numerous other witnesses. We are unable to find the trial judge manifestly erroneous in his factual conclusions.
A party seeking to prove a change in domicile must overcome the presumption that it has not been changed by positive and satisfactory proof of the establishment of another, the intention to remain there, and the abandonment of the former domicile. * * * The presumption of the original domicile prevails if any reasonable doubt thereof exists. * * * [Citations omitted.]
Lauga v. Lauga, 537 So.2d 758, 760 (La. App. 4 Cir.1989).
Everyone has a domicile of origin which he retains until he acquires another. * * * One who asserts that there has been a change of domicile has the burden of proving that change. * * * So long as a reasonable doubt remains, however, the presumption is that the previously established domicile of the person, or his domicile of origin, has not been changed. * * * [Citations omitted.]
Lafleur v. Seaboard Fire & Marine Insurance Co., 296 So.2d 860, 863 (La.App. 3 Cir.1974), writ refused, 300 So.2d 185 (1974).
The trial judge expressed doubt regarding "whether or not [Prosperie] truly intended to be domiciled in [Mississippi]." We agree; the plaintiff did not carry his burden of proof on this issue. We conclude the domicile of origin, i.e., Louisiana, had not changed during the period at issue. Lafleur, supra.

MOTION OF JEFFERSON PARISH
Finally, the Parish of Jefferson, which is a defendant in the suit but not a party to this appeal, has filed a motion to remove its name as appellee. This appeal concerns only the exceptions filed on behalf of the Prosperies regarding Waguespack's suit against them. Mr. Prosperie, who represents himself on the appeal, contests the granting of this motion, apparently on the assumption that granting the motion would dismiss the Parish from the suit.
We deny the motion for mootness; it is a superfluous pleading because the Parish is not a party to this appeal. The term appellee includes any non-appellant party to a suit, whether involved in the appeal or not. The designation places no additional burden or liability on the Parish and does not affect its status as a defendant.

DECREE
For the foregoing reasons, the judgment sustaining the Prosperies' exception of prescription and dismissing Waguespack's suit against them is affirmed. Costs are assessed against the appellant.
AFFIRMED.
NOTES
[1] Mrs. Prosperie died during the course of the litigation prior to trial.